■ THOR PROPERTIES, LLC, Appellant-Respondent, v THE CHETRIT GROUP LLC et al., Respondents-Appellants. [936 NYS2d 196]—

In 2007, the parties agreed to acquire jointly the Florida Westin Diplomat Hotel and a number of related facilities, including a country club, golf course, parking garage and vacant land, through a nonparty acquisition vehicle named Komar Five Associates, LLC (Komar). Komar's bid for the property was successful, but between execution of the purchase agreement for the property and the closing, the parties' relationship soured and they agreed to part ways. The parties arranged for defendants to purchase plaintiff's shares in Komar via a letter agreement dated July 16, 2007 (the settlement agreement). Under the terms of the settlement agreement, the parties agreed that plaintiff would receive immediate reimbursement of its share of the deposit and an additional $12.5 million.* Accordingly, defendants were to pay upon execution of the settlement agreement $6,666,666.66 representing plaintiff's deposit. That amount was "non refundable in any and all circumstances." Defendants were to pay an additional $6.25 million immediately. Those funds were to be nonrefundable, except in the event title fails to close for any reason other than Komar's default:

"In addition, the undersigned agrees to pay you the sum of . . . $12,500,000.00 . . . as follows:

---

* The $12.5 million represented the price the parties negotiated for Thor's interest in the venture that defendants were to purchase.

"(i) the sum of . . . $6,250,000.00 . . . by wire transfer of immediately available funds to the account listed on Exhibit A which sum shall be non refundable except if title fails to close for any reason other than Komar's default."

Finally, the parties agreed that in the event title closed or the property was assigned to a third party, plaintiff would receive another $6.25 million: "(ii) the sum of . . . $6,250,000.00 . . . (the "Escrow Funds") by wire transfer of immediately available funds to Thor to the account listed on Exhibit A or to any other account designated by Thor on the earlier to occur of (a) the closing of title to the Property (the "Closing") or (b) the assignment of the Agreement to any third party which is not owned and/or controlled by one or more members of the Chetrit family (in which event the aforesaid sum of . . . $6,250,000.00 . . . shall be due and payable upon receipt by the undersigned of the consideration for the assignment to such third party)." Although the first payment of $6.66 million was not refundable under any circumstances and the second payment of $6.25 million was refundable "if title fails to close for any reason other than Komar's default," nothing in the settlement agreement discussed whether or not this third installment of $6.25 million was refundable.

Eventually, Komar refused to close, allegedly because new zoning restrictions affected the profitability of the project. In a related lawsuit, we held that Komar did not demonstrate a lawful excuse for its failure to close and upheld the decision of the motion court awarding the seller the contract deposit as liquidated damages for Komar's breach (*see Diplomat Props., L.P. v Komar Five Assoc., LLC*, 72 AD3d 596 [2010], *lv denied* 15 NY3d 706 [2010]).

In this lawsuit, plaintiff claims that it is entitled to the third payment of $6.25 million, because Komar willfully failed to close thereby causing the failure of the condition precedent and consequently depriving plaintiff of its right to the final payment. Plaintiff cites the "prevention" or "hindrance" doctrine whereby a "defendant cannot rely on the condition precedent to prevent recovery where the non-performance of the condition was caused or consented to by itself" (*O'Neil Supply Co. v Petroleum Heat & Power Co.*, 280 NY 50, 56 [1939]; *see also Arc Elec. Constr. Co. v Fuller Co.*, 24 NY2d 99, 103-104 [1969]). However, the prevention doctrine, a variant of the implied covenant of good faith and fair dealing, is only applicable when it is consistent with the intent of the parties to the agreement (*see HGCD Retail Servs., LLC v 44-45 Broadway Realty Co.*, 37 AD3d 43, 53 [2006]). Here, the parties' settlement agreement clearly

provided that the first payment was completely nonrefundable, the second payment was refundable if title failed to close through no fault of Komar, and plaintiff only became entitled to the third payment if title closed or an assignment occurred. Neither happened. Accordingly, plaintiff never became entitled to the third payment.

Plaintiff's argument that the parties incorporated the language concerning Komar's purposeful default from section B (i) into section B (ii) governing the third payment is contrary to the terms of the agreement. The parties clearly were capable of expressing the circumstances under which the right to payment vested. Had the parties meant to entitle plaintiff to the funds discussed in section B (ii) upon Komar's default, they certainly were capable of crafting language to that effect.

In addition, plaintiff argues that, regardless of the language in the settlement agreement, under the prevention doctrine, defendant cannot rely on the failure to close as an excuse not to pay plaintiff, because defendant is responsible for that failure. This argument misses the mark. By leaving out the words "except if title fails to close for any reason other than Komar's default" from section B (ii), the parties in essence contracted around the prevention doctrine. Thus, the parties considered the possibility of default and accorded liability (to defendants) for only one half of the $12.5 million. Imposition of the prevention doctrine to award the full $12.5 million to plaintiff would be inconsistent with a plain reading of the agreement.

The motion court also properly dismissed defendants' counterclaim for rescission of contract based on mutual mistake. To void a contract for mistake, the mistake must be mutual, substantial and must exist at the time the parties enter into the contract (*see 260/261 Madison Equities Corp. v 260 Operating*, 281 AD2d 237 [2001]). This Court previously found that there was neither a prior agreement with the relevant municipality limiting development, nor any guarantee that development would be permitted (*Diplomat Props.*, 72 AD3d 596). Because it was always uncertain whether the City would permit or deny further development of the property, any assumption about the ability to develop property could not have existed at the time the parties entered into the agreement.

A party will not be relieved of its contractual obligations on the basis of an intervening contingency when it would have been reasonable to provide for such contingency in the contract (*see Kel Kim Corp. v Central Mkts.*, 70 NY2d 900 [1987]; *P.K. Dev. v Elvem Dev. Corp.*, 226 AD2d 200 [1996]). The ability to secure favorable zoning rulings is a well known risk in any

property development project, and if expansion of the property was the key to profitability, as defendants claim, they should have explicitly handled that contingency in the settlement agreement. Concur—Friedman, J.P., Catterson, Moskowitz, Freedman and Abdus-Salaam, JJ. **[Prior Case History: 27 Misc 3d 1216(A), 2010 NY Slip Op 50770(U).]**